**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

MARIA ORTIZ-ARREOLA,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security

Defendant.
_______________________________/

Case No. 1:09-cv-00702-JLT

ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT

ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 4-5(g)

ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT MICHAEL J. ASTRUE

**BACKGROUND**

Plaintiff Maria Ortiz-Arreola ("Plaintiff") seeks judicial review of an administrative decision denying her claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS[1]**

On August 1, 2006, Plaintiff filed an application for SSI benefits under Title XVI of the Act alleging that disability had prevented her from working since January 1, 2005. See AR at 111. After the agency denied benefits, Plaintiff requested a hearing before an Administrative Law Judge

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

("ALJ"). Id. at 90. The ALJ held a hearing on May 29, 2008. Id. at 19-60. On July 23, 2008, the ALJ issued a decision denying benefits. Id. at 7-18. Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Id. at 18. On March 27, 2009, the Appeals Council affirmed and it became the decision of the Commissioner. Id. at 1-3.

Hearing Testimony

Plaintiff testified that she lived alone with her two sons, ages 10 and 16. AR at 23. She indicated that she had a 10th grade education, but stated that she was in special education classes exclusively from the third grade. Id. at 24-25. She asserted that she couldn't write in English, but clarified that "probably," with difficulty, she could write a note to her boys if she was going to be away from the house. Id. at 25-26. She stated that she was "embarrassed" because she couldn't write. Id. at 46. As an example, she recounted that while working as a hotel housekeeper, she was unable to write a note to a patron if she needed to leave a message. Id.

Plaintiff testified that she could read in English but was not sure if she could read a newspaper. AR at 26. She stated that she could not write or read in Spanish. Id. at 26. She indicated she had no vocational training. Id.

Plaintiff testified that she had not worked since 1995. AR at 26. She stated that she last worked cleaning private homes. Id. Before that, she reported that she cleaned hotel rooms. Id. For a brief period in 2003, Plaintiff stated that she was paid to provide in-home care for her two children, who she described as suffering from mental problems. Id. at 27, 47. She indicated that the need to care for her children prompted her to quit working between 1995 and 2003. Id. at 47.

Plaintiff testified that her life changed completely in January 2005, after she developed breast cancer and had a mastectomy. AR at 28. Following surgery, Plaintiff stated that she went through months of radiation and chemotherapy treatments. Id. at 29-30. She believed that even after these treatments ended, the chemotherapy, in particular, "messed up a lot of things inside me." Id. at 31. Plaintiff believed that her cancer continued to cause her to bleed from time to time, mostly when she went to the bathroom. AR at 32. She stated that she was scheduled to have a colonoscopy "pretty soon." Id.

Plaintiff testified that she had difficulty with her right hand and arm. AR at 32. She stated

that this problem was diagnosed by doctors as lymphedema. Id. She indicated that she used a "sleeve" for her arm to help with this problem. Id. at 33. She believed that the sleeve helped with the pain, but stated that if she wore it for too long it caused pain as well. Id. at 34.

Plaintiff described pain in her right hand, arm and shoulder. AR at 34. She stated that this pain hindered her ability to hold things. Id. at 37. She did not believe that she could use her right arm for more than five minutes at a time. Id. at 35. After that, she estimated that she would have to rest her arm for about one hour before using it again. Id. Also, she stated that she could not reach overhead with her right arm or get things out of a cupboard because of the pain. Id. She believed that she could reach out at shoulder level if she was "careful." Id. at 36. She believed that she was incapable of repetitive use of her right arm at or above shoulder level and stated that a treating doctor told her not to use her arm in this way. Id.

Plaintiff described swelling in her right hand and wrist on a daily basis. AR at 36. She stated that she elevated her arm to alleviate her pain. Id. at 36-37. She described doing this each day for about 30 minutes. Id. at 37. In addition, she stated that she performed exercises prescribed by the doctor and believed that this helped with the swelling but not the pain. Id. She testified that this problem prevented her from holding and grasping with her right hand. Id.

Plaintiff stated that her problems with her right hand and arm made vacuuming difficult. AR at 38. She believed that she could lift a gallon of milk for about five minutes at one time but stated that this would cause a lot of pain. Id. at 39. After doing this, she estimated that she would need to rest her hand and arm for about 30 minutes. Id. at 40.

Plaintiff testified that she had difficulty concentrating. AR at 46. She believed that she could concentrate for no more than 30 minutes at one time. Id. After that, she believed she would need to rest for about one hour. Id.

Plaintiff testified that she took the drug Tamoxifen because of her cancer. AR at 31. She stated that she took the Tamoxifen twice daily. Id. at 40. She believed that the Tamoxifen made her sleepy. Id. She described this sleepiness as lasting about one hour and stated that she would need to lie down. Id. at 41. In addition, she stated that she took aspirin for a congenital heart condition (a small hole in her heart).

In all, Plaintiff estimated that she needed to lie down three- to-four times a day for at least 30 minutes. AR at 41. She believed that the medication she took hindered her ability to do her prior cleaning-type work. Id. at 47. In addition, she believed that the pain she experienced from her impairments hindered her ability to do that type of work. Id. at 47.

Plaintiff testified that she had difficulty walking. AR at 42. She stated that one leg was shorter than the other and this caused her to walk with a limp. Id. She believed that she could walk about 30 minutes at one time. Id. She believed that she could stand about 30 minutes at one time. Id. She described needing to shift her legs if she tried to stand and do the dishes because of pain. Id. She estimated that she could sit for about one hour at one time. Id.

Plaintiff testified that she could not do any physical activity for longer than 30 to 40 minutes without needing to lie down and rest. AR at 43. She stated that she did not do much house work but cooked for her children as often as two-to-three times a day. Id. at 44. She stated that cleaning the house was very difficult and made her hand hurt. Id. at 45. She reiterated that vacuuming was particularly difficult. Id. She reported that she talked to her doctors about her pain but they told her that she would have to learn to deal with it. Id. She wished that someone could help her with the housework. Id. at 44.

A vocational expert ("VE"), Judith Najarian, testified. She described Plaintiff's past work as a motel housekeeper as light and unskilled work. AR at 48. She characterized her work as a house cleaner (day cleaner) as medium and unskilled, but modified this to "light" work because of Plaintiff's description of her actual work. Id. She described Plaintiff's work as a home attendant as unskilled and medium. Id.

The ALJ posed a hypothetical to the VE in which he described a person of Plaintiff's age, educational background and work history, who was limited to light exertional activity, with no pushing/pulling or reaching with the right dominant upper extremity above the shoulder but had no restriction with the left extremity. AR at 49. Also, hypothetical limited the person to work involving simple, repetitive tasks with no writing. Id. The VE opined that this person could not perform Plaintiff's past work, but could perform other light, unskilled work involving no arm activity above the shoulder. AR at 49. As examples, she cited the jobs of poultry cutter, fruit cutter and ticket

taker. Id.

The ALJ posed a second hypothetical, the same as the first, but with additional limitations prohibiting frequent handling, fingering and feeling with the right hand. AR at 50. Again, the VE stated that this person could not perform Plaintiff's past work but could perform other work. Id. While she did not believe that such a person could perform the jobs of poultry cutter and fruit cutter, she believed that the person could perform the job of ticket taker. Id. In addition, she believed that the person could perform the jobs of store greeter and swatch clerk. Id. at 51.

In a third hypothetical, the ALJ added limitations based on chronic fatigue and pain that would limit the person to working in increments of no more than two hours. AR at 51. The VE stated that such a person could not do any full-time work. Id.

Relevant Medical Evidence

Notes from Dr. Bruce McAllister at the California Cancer Center document that Plaintiff underwent a mastectomy on January 3, 2005. AR at 195. Following this surgery, Plaintiff underwent several months of radiation and chemotherapy treatments. Id. By early 2006, x-rays and a mamogram indicated that Plaintiff was cancer-free. Id. at 186.

Dr. Izhar Hasan examined Plaintiff on October 8, 2006. Plaintiff's main complaints involved general fatigue, increasing weakness and mild shortness of breath. AR at 215. Dr. Hasan found Plaintiff to be awake, alert and oriented in all spheres. AR at 216. He detected no hypertrophy in her neck muscles and described her range of motion as normal. Id. at 217. He found no abnormalities in her back, but noted "mild lymphedema" in her right upper extremity. Id. at 218. He characterized her motor strength, reflexes and gait as normal. Id.

Dr. Hasan diagnosed Plaintiff with fatigue, likely a medication-related side effect, and also noted her breast cancer history and history of a congenital heart defect. AR at 219. He believed that she could lift and carry 20 pounds occasionally and 10 pounds frequently, stand/walk for six hours in an 8-hour day and sit without restriction. Id.

On October 20, 2006, Dr. Richard Engeln, a clinical psychologist, examined Plaintiff. He described Plaintiff as alert and oriented, with no evidence of delusions, hallucinations or confusion. AR at 221. He found Plaintiff to be well-kempt and groomed. Id.

Dr. Engeln characterized Plaintiff's verbal expression as appropriate but noted that she was anxious about the examination. AR at 222. Dr. Engeln administered several tests, including the Wechsler Adult Intelligence Scale III, the Wechsler Memory Scale III, the Bender-Gestalt Test II, and the Wide Range Achievement Test R. Id. He determined that Plaintiff had a verbal IQ of 69, a performance IQ of 68 and a full scale IQ of 66. Id. He characterized these findings as indicative of a mild range of mental retardation. Id.

Dr. Engeln interpreted the various memory measurements taken of Plaintiff as indicating borderline to low average functioning. AR at 222. He characterized her academic skills as reading at fourth-grade level, spelling at second-grade level and arithmetic at fifth-grade level. Id.

Dr. Engeln found no evidence of mental or emotional illness. AR at 222. He noted that her interview presentation suggested mid-borderline intelligence skills, with her verbal and visual intelligence in the mild mental retardation range. Id. However, he believed that her abilities might be understated and thought that she might have "educational issues" because her memory scores were significantly higher than her intelligence measurements. Id.

Dr. Engeln concluded that Plaintiff was verbally, cognitively and socially capable of job adjustment and managing her funds. AR at 223. He believed that she could perform one- to-two step simple job instructions but not complex or technical ones. Id. He opined that she was mentally capable of work that was consonant to her previous work. Id. Primarily, he believed any restrictions to job adjustment were physical in nature. Id.

Dr. A.H. Middleton, a non-examining agency consultant, completed a "Psychiatric Review Technique" on November 15, 2006. He described Plaintiff's primary mental problems as affective disorder and mental retardation. AR at 252. While noting significant subaverage general intellectual functioning and "mild academic delay," he found only mild restrictions in activities of daily living and in maintaining concentration, persistence and pace. Id. at 255, 260.

Dr. R. Amaro, another non-examining agency consultant, completed a mental Residual Functional Capacity ("RFC") assessment that same day. He noted moderate limitations in Plaintiff's ability to understand, remember and carry out detailed instructions. AR at 263. In all other cognitive areas, Dr. Amaro found no significant limitations. Id. at 263-64. He believed that Plaintiff was

capable of following simple directions, but would have difficulty with detailed directions. Id. at 265.

Dr. R.D. Fast, a third non-examining agency consultant, provided a case analysis on March 29, 2007. He noted Plaintiff's IQ scores in the 60s, and believed that initial agency reviewers overlooked Listing 12.05C, which relates to presumed disability based upon mental retardation. AR at 266. However, he noted Dr. Engeln's belief that Plaintiff's memory scores indicated a significantly higher level of functioning than the IQ scores. Id. Also, he highlighted "questions" about Plaintiff's credibility, noting her allegations of fatigue and complaints of side effects from her medications despite the fact that she was no longer receiving chemotherapy treatments. Id.

Dr. Fast concluded that if the mental retardation findings were not accurate, Plaintiff could perform work involving simple, repetitive tasks. AR at 266. However, he believed that if the mental retardation findings were accurate, that diagnosis satisfied the listings for presumed disability, in particular, Listing 12.05C. Id.

ALJ Findings

The ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation. First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 14, 2006. AR at 12. Second, he found that Plaintiff had the following severe impairments: right upper extremity lymphedema, history of right breast cancer and status post mastectomy, and borderline intellectual functioning. Id. Third, the ALJ determined that no impairment, or combination of impairments, met or exceeded the level required under agency guidelines for presumed disability. Id. at 13.

Fourth, the ALJ determined that Plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for six hours out of an eight-hour day; but was limited to frequent handling, fingering, and feeling with the right dominant hand with no work with the right dominant upper extremity above the shoulder level; and to performing simple repetitive tasks with no writing duties. AR at 10. Based on his RFC finding and the VE's testimony, the ALJ determined that Plaintiff could not perform any of her past relevant work. See id. at 16-17. However, at Step Five, the ALJ determined, again based on his RFC assessment and the VE's testimony, that Plaintiff retained the ability to perform other work in the national economy,

specifically citing the jobs of ticket taker, greeter, and swatch clerk. Id. at 17. As a result, the ALJ determined that Plaintiff was not disabled as defined by the Act. Id. at 18.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. When reviewing the findings of fact, the Court must determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. 405 (g).

Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The Court must uphold the determination that the claimant is not disabled if the Commissioner applied the proper legal standards and if the findings are supported by substantial evidence. See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which include the five-step sequential disability evaluation process described above. 20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[2] As noted, applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since July 14, 2006; (2) had medically determinable severe impairments (right upper extremity lymphedema, history of right breast cancer and status post-mastectomy, and borderline intellectual functioning); (3) did not have an impairment or combination of impairments which met or equaled one of the listed impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) was not able to perform her past relevant work; but (5) retained the ability to perform other work in significant number at the state and national level. AR at 12-17. The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. Id. at 18.

Plaintiff challenges the ALJ's determination at Step Five of the sequential evaluation process, where her ability to perform other work in the state and national economy was assessed based upon her RFC. In particular, Plaintiff challenges the ALJ's reliance on the VE's opinion that she could perform jobs such as ticket taker, greeter and swatch clerk. (See Doc. 17 at 8-14). Plaintiff alleges also that the ALJ erred by failing to consider whether she was presumptively disabled at Step Three based on her mental impairment. (See id. at 14-18).

**DISCUSSION**

1. The ALJ's reliance upon the VE's opinion to conclude Plaintiff could perform other work was error

At the hearing, the ALJ posed a hypothetical to the VE describing a person of Plaintiff's age, educational background and work history, who was limited to a light exertional level, with no pushing/pulling with the right dominant upper extremity above shoulder level, who was limited to simple repetitive tasks where no writing is required and limited to frequent handling, fingering and feeling with the right dominant hand. See AR at 49, 50. The VE opined that such a person could not perform Plaintiff's past work, but could perform "light, unskilled [jobs] where the arm activity is not above shoulder level." Id. at 49. As an example, she cited jobs such as ticket taker, greeter, and swatch clerk. Id. at 49-50. The ALJ incorporated the limitations in this hypothetical in his RFC

[2] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

finding and cited specifically the VE's opinion in concluding that Plaintiff could perform other work (noting the jobs identified by the VE). Id. at 17.

Plaintiff argues first that the hypothetical posed to the VE, and relied upon by the ALJ as his basis for his ultimate conclusion, failed to encompass all of her educational limitations. (See Doc. 17 at 8-12). As a result, Plaintiff argues that the VE's conclusion that Plaintiff retained the ability to perform the jobs of ticket taker, greeter, and swatch clerk was without evidentiary support and the ALJ's reliance upon the VE's opinion was error. (See id.)

The Commissioner may carry his burden of showing an ability to do other work by eliciting the testimony of a VE in response to a hypothetical that sets out all the limitations and restrictions of the claimant that are supported by the record. Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995). A hypothetical question posed to a VE must include all impairments supported by substantial evidence. Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001). Reliance on a hypothetical that fails to include all accepted limitations is insufficient to carry the agency's burden of proving the ability to engage in alternative work. Andrews, 53 F.3d at 1044.

As an initial matter, Plaintiff notes that the ALJ wrote in his decision that Plaintiff had a "high school education." AR at 17; see 20 C.F.R. § 416.964(4) (defining a "high school education" as involving "reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above.") Defendant concedes that this was incorrect and describes this as a "typographical error." (Doc. 18 at 6). In addition, he contends that this error was harmless because no reference to a "high school education" was presented in the hypotheticals the ALJ posed to the VE. (See id. at 7).

The Court agrees. No reference to this level of education was made by the ALJ at the hearing or posed in any of the hypotheticals. Thus, the VE's opinion was not predicated on Plaintiff having a high school education. On the contrary, the VE was present and heard Plaintiff testify that she had a 10th grade education and was exclusively in special education classes from the third grade. See AR at 21, 24. Thus, despite the ALJ's erroneous statement in his order, there is no evidence that the VE did not rely upon Plaintiff's testimony concerning her level of education. In fact, Plaintiff acknowledges that "[t]he record does not reveal any evidence that the vocational expert ever

considered Ms. Ortiz to be a high school graduate." (Doc. 17 at 8)

Nevertheless, Plaintiff argues that the even if the VE relied upon Plaintiff's testimony in responding to the hypothetical, the VE's information was incomplete because she was not provided the results of the objective testing which indicated that Plaintiff functioned at a much lower level than her testimony revealed. In particular, Plaintiff cites testing conducted by Dr. Engeln that indicated that she read at a fourth grade level and spelled at a second grade level. See id. at 9-10; AR at 222.

As noted, although the ALJ's hypotheticals describe vaguely a person of Plaintiff's "educational background," the VE was present for Plaintiff's testimony. She heard Plaintiff testify to a 10th grade education that was almost exclusively spent in special education classes. She also heard Plaintiff testify to serious deficiencies with respect to writing and reading. In light of this, and the ALJ's limitation in the hypothetical to jobs involving simple, repetitive tasks with no writing required, the hypothetical addressed Plaintiff's testimony that she was, effectively, functionally illiterate. See Buffin v. Astrue, 2009 WL 4254403 (E.D. Cal., Nov. 24, 2009) at *9-10 (indicating that where the ALJ's hypotheticals referred to a person of the plaintiff's educational background, and the VE was present and heard the plaintiff's testimony as to that background, the hypotheticals were complete and supported by substantial evidence). Plaintiff concedes that the Medical-Vocational Guidelines establish that a person of her age who is capable of performing light and unskilled work is not per se disabled even if she is illiterate. (See Doc. 17 at 9); see also 20 C.F.R., Part 404, Subpt. P, App. 2, Table 2, Rule 202.16.

This does not end the inquiry, however. Plaintiff alleges an inconsistency between the functional requirements of the jobs of ticket taker, greeter, and swatch clerk outlined in the DOT, particularly for reasoning, reading and writing, and the VE's opinion that she was capable of performing these jobs. (See Doc. 17 at 12-14). Social Security Ruling ("SSR") 00-4p states, in pertinent part:

> Occupational evidence provided by a VE or VS generally should be consistent with information supplied by the DOT. When there is an apparent conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the

adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

Because the "best source" for how a job is generally performed is "usually" the DOT (Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001)), for the ALJ to accept vocational expert testimony that conflicts with the DOT, the record must contain "'persuasive evidence to support the deviation.'" Id. at 846. Moreover, the ALJ has an affirmative duty to ask "whether [the VE's] testimony conflicts with the *Dictionary of Occupational Titles*." Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007). Not only must the ALJ ask the VE if his or her opinion is consistent with the DOT, *the ALJ must "obtain a reasonable explanation for any apparent conflict."* Id. at 1152-53 (emphasis added).

With respect to the jobs of ticket taker and swatch clerk, the DOT provides the following reading and writing requirements under "GENERAL EDUCATIONAL DEVELOPMENT - Language:

Level 2 - READING: Passive vocabulary of 5,000 - 6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

WRITING: Write compound and complex sentences, using cursive style, proper pronunciation, and employing adjectives and adverbs.

(Doc. 17, Ex. 2 at 2, 10). In addition, the lowest reasoning level for these jobs (applicable to the jobs of ticket taker and swatch clerk) is classified by the DOT as Level Two. This level requires an ability to "[a]pply common sense understanding to carry out detailed but uninvolved written or oral instructions." (Doc. 17, Ex. 2 at 1, 9).

Similarly, the reading and writing requirements for the job of "Goodwill Ambassador" or "Welcome-Wagon Host/Hostess" provide:

Level 3 - READING: Read a variety of novels, magazines, atlases, and encyclopedias. Road safety rules, instructions in the use of maintenance shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

WRITING: Write reports and essays with proper format, punctuation, spelling, and

grammar, using all parts of speech.

(Doc. 17, Ex. 2 at 6).

After the VE offered her opinion that Plaintiff could perform these jobs, the ALJ asked her if her findings were "consistent" with the DOT. AR at 50. The VE responded simply "Yes." Id. The ALJ did not ask any further questions or seek any additional explanation. This was inadequate. As noted, the lowest reading and writing level for any of these jobs, requires a "[p]assive vocabulary of 5,000-6,000 words" and a reading rate of "190-215 words per minute." (Doc. 17, Ex. 2 at 2, 10). In contrast, Plaintiff testified she could not read a newspaper. AR at 26. The DOT standard requires the ability to write "compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs." (Doc. 17, Ex. 2 at 2, 10). Plaintiff testified that her writing and spelling skills were so poor that she was incapable of writing notes to patrons at the hotel where she last worked. AR at 46. The lowest applicable reasoning level for these jobs under the DOT, Level 2 (ticket taker and swatch clerk), requires the ability to "[a]pply commonsense understanding to carry out *detailed but uninvolved written* and oral instructions." (Doc. 17, Ex. 2 at 1, 9) (emphasis added). The evidence is consistent that Plaintiff could complete only simple, one-to-two step instructions. Notably, the ALJ did not dispute Plaintiff's testimony concerning her severe limitations for reading, writing and spelling. In fact, he tacitly accepted her testimony because in the pertinent hypotheticals posed to the VE and, ultimately in his RFC finding, he included a limitation to jobs "where no writing is required as a job duty." AR at 50; see also AR at 14.

While a claimant is not per se disabled simply because he or she is illiterate or mentally impaired, "in order for an ALJ to rely on a job description in the Dictionary of Occupational Titles that fails to comport with a claimant's noted limitations, the ALJ must definitively explain this deviation." See Pinto, 249 F.3d at 847. In this case, the ALJ merely accepted the VE's one word response that her opinions, based on the ALJ's hypothetical, were consistent with the DOT. At the very least, the ALJ needed to ask the VE for further explanation in light of the apparent differences. See Massachi, 486 F.3d at 1152-53 (holding that in asking the VE if the evidence he or she is providing is consistent with the DOT, the ALJ should "obtain a reasonable explanation of an apparent conflict"); see also Pinto, 249 F.3d at 846 ("Illiteracy seriously impacts an individual's

ability to perform work-related functions such as understanding and following instructions, communicating in the work place, and responding appropriately to supervision.")

For these reasons, the Court concludes that the ALJ erred in accepting the VE's opinion that Plaintiff could work as a ticket taker, greeter, or swatch clerk without obtaining an explanation of how that opinion comports with the requirements for these jobs provided in the DOT.[3]

2. The ALJ erred by failing to address whether Plaintiff met or equaled the requirements for presumed disability at Step Three based on mental retardation

Plaintiff contends next that the ALJ erred at Step Three by failing to consider whether her condition met or equaled the requirements for presumed disability based on mental retardation found at 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.05C. (Doc. 17 at 14-18).

It is Plaintiff's burden to establish that his impairment met a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987). Mere diagnosis of a listed impairment is not sufficient to sustain a finding of disability; there must also be the findings required in the listing. Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990). It has been held that it is not necessary for the ALJ to state specifically what evidence supports the conclusion that the claimant's impairments do not meet or exceed a listing; rather, it is sufficient for an ALJ to summarize the pertinent record, including the doctor's information regarding symptoms and the claimant's testimony, and to make specific findings essential to the conclusion such that a reviewing court may know the basis for the conclusion. It is unnecessary to require the Commissioner, as a matter of law, to state why Plaintiff failed to satisfy every listing. Gonzalez v. Sullivan, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

The introductory paragraph of § 12.05 states that,

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age

---

[3] In addition, the Court notes an incongruity between the VE's determination that Plaintiff could work as a "greeter such as you find in the front of stores," see AR at 51, and her corresponding citation to the job designation for "Goodwill Ambassador" and/or "Welcome Wagon Host/Hostess" in section 293.357-018 of the DOT. Id. The DOT describes the latter job as encompassing several characteristics beyond that of a store front greeter. For instance, the DOT describes the ability to develop lists "of prospective clients from such sources as newspaper items, utility company records, and local merchants," and the ability to prepare reports. These functions go well beyond the skills required to serve as a simple store greeter and well beyond the limitations the ALJ propounded in his hypothetical restricting Plaintiff to jobs involving simple, repetitive tasks with no writing duties. AR at 50.

22.

20 C.F.R., Part 404, Subpt. P, App. 1, § 12.05. In addition, subsection C requires an additional showing of "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. In Gomez v. Astrue, 695 F.Supp.2d 1049 (C.D. Cal. 2010), the court noted that

> In order to meet most of the mental disorder listings, a claimant must demonstrate the existence of impairment-related functional limitations that are incompatible with the ability to do substantial gainful activity and that are the result of the mental disorder described in [the] listing, which must be manifested by the medical findings specified for that disorder. Section 12.05 does not follow that pattern. "The structure of the listing for mental retardation (12.05) is different from that of other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that [the claimant's] impairment meets the listing."

Id. at 1052-53 (citation omitted).

Plaintiff contends that her IQ scores satisfy the requirements for presumed disability under § 12.05C. In addition, she asserts that the ALJ never questioned the validity of the IQ scores, and argues that his failure to address whether Plaintiff's mental condition satisfied this listing was error warranting remand. (See Doc. 17 at 17). Defendant concedes that the ALJ failed to address whether Plaintiff's mental condition satisfied the requirements for presumed disability found in § 12.05 of the listings. However, he argues that this failure was not error because Plaintiff "fails to point to anything in the record that could even arguably satisfy the [diagnostic] criteria [in the introductory paragraph]." (Doc. 18 at 8).

The Court disagrees. Testing by Dr. Engeln indicated IQ scores (Verbal IQ of 69, Performance IQ of 68, and Full Scale IQ of 66) which he characterized as being in the "mild range of mental retardation." Doc. 17 at 16; AR at 222. Moreover, Dr. Fast concluded that if her IQ scores were valid, she satisfied the listings for presumed disability under Listing 12.05C. AR at 266.

In addition, Plaintiff's testimony reflected that her intelligence delays were "manifested" prior to age 22 and were apparent from at least third grade. She testified that she did not function well in school, could not keep up with other kids in normal classes and had been in special education classes from that time. See Doc. 19 at 2; AR at 24-25. This evidence, plus the ALJ's conclusion that

Plaintiff suffered from other "severe" physical impairments (lymphedema and history of right breast cancer) is sufficient to satisfy the requirements in § 12.05's introductory paragraph and refutes Defendant's assertion that Plaintiff has failed to produce evidence which could satisfy the requirements of § 12.05C. See Lewis v. Astrue, 2008 WL 191415 at *5 (N.D. Cal., Jan. 22, 2008) (holding that even one IQ score in the 60- to-70 range, in combination with another impairment "will, by itself, satisfy the intellectual functioning requirement" in § 12.05's introductory paragraph if Plaintiff can "put forth evidence that this level of functioning was "initially manifested" prior to age 22).

Other cases support remand. In Gomez, the plaintiff contended that he had a valid IQ and other functional limitations that met the requirements of § 12.05C. See 695 F.Supp.2d at 1052. As in this case, consultative psychological examiners documented valid IQ scores within the 60- to-70 range or lower, and the ALJ found that Plaintiff had a medically determinable impairment of "borderline intelligence." See id. at 1052-1055. Nevertheless, the ALJ, while not challenging the validity of the IQ scores, relied on testimony from another doctor "and other evidence suggesting that plaintiff had 'mild functional limitations [that] did not equal' any listing." Id. at 1057.

The Gomez Court reversed and noted that "section 12.05 is structured differently than other mental disorder listings," and held that "a clamant can meet the "C" criteria . . . without having to demonstrate a disabling, or even severe, level of mental functional impairment." Gomez, 695 F.Supp.2d at 1057 (quoting Thresher v. Astrue, 283 Fed.Appx. 473, 475 (9th Cir., June 19, 2008)). The court stated that "the ALJ cannot disregard a valid IQ simply because other evidence in the record could support a finding of nondisability in the absence of such a score." Id. (quoting Thresher v. Astrue, 283 Fed.Appx. 473, 475 (9th Cir., June 19, 2008)).

In Thresher, the claimant argued that she satisfied "one of the four sets that comprise [§ 12.05]." 283 Fed.Appx. at 474. Evidence indicated that Plaintiff had two IQ scores within the 60-70 range as required in subsection C. Id. at 475. Noting that the ALJ failed to discuss the applicability of § 12.05, the Court ordered the matter remanded.

> The ALJ did not expressly discuss [§ 12.05], but the evidence will support a determination that Thresher does come within [subsection C] because two of her IQ scores were in the 60 through 70 range, that mental condition began before she was

> 22 years of age, and she does have an additional physical impairment. Here the ALJ did suggest that Thresher was not functionally mentally retarded, but the ALJ's failure to reference § 12.05 and, in particular, Listing 12.05C makes it unclear whether the ALJ came to grips with the specific requirements of that section when she issued her decision. We do not doubt that an ALJ can decide that an IQ score is invalid. The regulations' inclusion of the word "valid" in Listing 12.05C makes the ALJ's authority clear. But here, while the ALJ pointed to the level of Thresher's functioning, she did not find that the score was invalid, and the listing does not speak to functioning - it speaks only to the IQ score itself. Thus, we remand to the Commissioner for clarification regarding the nature of the considerations applied at step 3 and, particularly, precisely what was decided and why.

Id. at 475 (citations omitted).

In this case, the ALJ never discussed the IQ scores determined by Dr. Engeln. Thus, the record is devoid of any finding by the ALJ as to whether he accepted the validity of those scores. Although the ALJ discussed Plaintiff's mental limitations within the context of § 12.00, see AR at 13-14, as noted in Thresher and Gomez, the criteria used to assess mental impairments in that section has no application to a § 12.05 determination which deals exclusively with mental retardation.[4] In light of Plaintiff's IQ scores, evidence that Plaintiff suffered from her mental condition from an early age and his finding that Plaintiff suffered other severe impairments, including lymphedema and a history of right breast cancer, the ALJ erred by failing to specifically discuss whether Plaintiff's mental condition satisfied the requirements for presumptive disability found at § 12.05C.

3. Remand for further consideration is appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate repayment of benefits is within the discretion of the district court. Harman v. Apfel, 211 F.3 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation. Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed where no useful

---

[4] Defendant suggests that Thresher and Gomez do not bolster Plaintiff's position because, unlike this case, in those cases "the claimant made an argument that satisfied the diagnostic criteria of Listing 12.05C, and . . . there was, apparently, an issue regarding the validity of the IQ scores obtained." (Doc. 18 at 9). As noted, the record in this case reveals evidence to support the requirements of the introductory paragraph of section 12.05. See Lewis, 2008 WL 191415 at *5. In addition, as in this case, the ALJ in Thresher failed to assess, let alone make a determination as to the validity of, the claimant's IQ scores. This failure was a prime basis for remand. See Thresher, 283 Fed.Appx. at 475. Thus, the Court disagrees that those cases are inapplicable.

purpose would be served by further administrative proceedings, or where the record is fully developed. Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because the issues addressed in this order require further clarification, and because it is not clear that an award of benefits to Plaintiff should result after these issues are addressed, the Court will order the matter remanded.[5] McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply award benefits is within the discretion of the court).

**CONCLUSION**

Based on the foregoing, this case is HEREBY REMANDED to the Secretary for further proceedings consistent with this decision. The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated: **July 28, 2010**

**/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE

[5] Plaintiff agrees that remand for further consideration by the Commissioner is appropriate. (Doc. 15 at 5, 6).